Opinion to: SJR TGT SN TJ EVK ERA GCH LCH JB









Opinion Issued April 27,
2006
 













 

     

 

 

 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-05-00091-CV

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



SABRINA YONKO, Appellant

 

V.

 

DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, Appellee

 

 



On Appeal from the 314th District Court

Harris County, Texas

Trial Court Cause No. 2004-04462J

 








 



OPINION ON REHEARING 

Sabrina Yonko appeals the trial
court’s judgment terminating her parental rights to her minor son
(“V.Y.”).  Yonko contends the evidence is
legally and factually insufficient to support the trial court’s findings that
(1) she knowingly allowed the child to remain in conditions which endangered
the child’s physical or emotional well-being; (2) she knowingly placed the
child with persons who engaged in conduct which endangered the child’s physical
or emotional well-being; (3) she was the major cause of the child’s failure to
be enrolled in school as required by the Education Code; and (4) it is in the
child’s best interest for Yonko’s parental rights to be terminated.  In our opinion dated December 22, 2005, we
held that the evidence was factually insufficient to support the trial court’s
finding as to issue four and therefore we reversed and remanded for a new
trial.  The State has filed a motion for
rehearing and motion for rehearing en banc. 
We withdraw our previous opinion and issue
this opinion in its stead.[1]  Our disposition remains the same.

Facts

          After
having been raped at age seventeen, Yonko gave birth to V.Y. in August 1995.  In 1996, Yonko began a relationship with Sam
Perez (“Perez”), the man whom Yonko later came to consider her husband and
V.Y.’s father.  Yonko testified that
their families did not approve of their relationship and, to put it mildly, did
not get along with each other.  She
testified that in one incident, her father went to jail and Perez’s father went
to the hospital after the two men had a fight, and in another, Perez’s father
showed up at her father’s house with gang members and guns.  As a result, Yonko and Perez traveled
wherever they thought they could find work and avoid problems with their
families.  She further testified that V.Y.
never witnessed any of the violence between their families.  Yonko estimated that during V.Y.’s childhood,
they spent about a year to a year and a half in San Diego, a month to a month
and a half in Las Vegas, four months in Phoenix, a couple months in Detroit, a
couple months in Houston, two years in Chicago, and a couple months in Hammond,
Indiana.  Yonko stayed either in motels
or with family members, and V.Y. was with Yonko at all times during this
period.  Yonko never enrolled V.Y. in school.  During this period, Yonko worked as an auto
body repair technician, and sold potpourri and roses at flea markets.  She at all times was gainfully employed.

          During
one visit to Houston in March 2002, Yonko was arrested and charged with
aggravated assault.  Yonko testified that
Perez was responsible for the assault, which was committed against a third
person, but that she pled guilty in an effort to avoid imprisonment.  The criminal trial court sentenced Yonko to
three years’ community supervision.  She
left Harris County soon thereafter to visit her grandfather, who she claimed
was having heart surgery.  As a result,
the court revoked Yonko’s community supervision, and sentenced her to two
years’ imprisonment.  At this time, V.Y.
was six years’ old.  Upon her
incarceration, Yonko placed V.Y. in her mother’s care.  Yonko testified that she believed her brother
(“Angelo”) and his wife would also help her mother (“Betty”) take care of
V.Y.  Yonko gave Betty $4,400, which she
had saved from working, to care for V.Y. and to pay for an attorney.

In May 2004, the Department of Family
and Protective Services (“DFPS”) received a referral of neglectful supervision
of V.Y. when he was found taking cookies from an apartment complex leasing
office.  V.Y. told police he had been
staying with his maternal uncle, Angelo, in the complex, and that his mother
and father were on vacation in Las Vegas. 
Apartment personnel told police that the padlocked apartment where V.Y.
claimed he had been living had not been occupied by Angelo, and that no one
named “Yonko” occupied any apartment in the complex or in the surrounding
area.  DFPS observed that V.Y.’s clothing
was dirty and torn, and that he had dirt caked in his nails, and took him into
custody.  Although he was eight years old,
V.Y. could not write his name, nor could he identify much of the alphabet and
some numbers.  

A week later, Angelo contacted DFPS
and provided inconsistent stories about why V.Y. was in his care.  Angelo claimed V.Y. had been staying with
Perez in Arizona, and that he went to get V.Y. in October 2003, but the DFPS
caseworker testified that she had some concerns about Angelo’s honesty.  After performing a home study, DFPS
determined that V.Y. should not live with Angelo because Angelo had been evicted
in the past; V.Y. was seen roaming the streets at one o’clock in the morning;
V.Y. shot someone’s window out with a BB gun while in Angelo’s care; Angelo
could not produce proof of income; Angelo and his wife already had two children
with a third on the way; and Angelo’s wife told DFPS that V.Y. would not follow
her instructions. 

Yonko learned that her son was in
DFPS’s custody from a social worker, and was then served in prison with the
lawsuit to terminate her rights.  Yonko
testified that she was shocked by what happened to V.Y. because Betty, Yonko’s
mother, loved V.Y. as much as she did, and she did not know the reason for
Angelo leaving V.Y. unsupervised.  Upon
learning about V.Y., Yonko had a “nervous breakdown,” meaning she started
shaking, would not eat, and had to be put on medication for a period of
time.  Yonko wrote approximately 200
letters to V.Y. after she learned what had happened.  V.Y. wrote her back six or seven times.  After being served, Yonko wrote numerous
letters to the district and county court clerks requesting an attorney.  The trial court appointed counsel for Yonko
approximately one month before trial.  

In accordance with the family service
plan created for her by DFPS, Yonko completed classes in prison on parenting,
anger management, and life skills, and participated in counseling.  Yonko testified that upon her release from
prison, scheduled to occur in less than thirty days after the trial of this
case, she would find employment, enroll V.Y. in school, and establish suitable
housing.  She testified that she had
learned the importance of an education, exemplified by her earning her G.E.D.
in prison, and that she regretted not enrolling V.Y. in school when he became
eligible.  Yonko testified that she
believed it was a responsible decision to leave V.Y. with Betty because Betty
was his grandmother and loved him.  Betty
herself was not available to testify because, according to the guardian ad
litem’s testimony, Yonko believed Betty was living in California at the time of
the trial. 

The DFPS caseworker testified that
she believed termination was in V.Y.’s best interest, but admitted that V.Y.
had expressed a strong preference to be with his mother.  The caseworker opined that V.Y. would be
“heartbroken” if his mother’s rights were terminated and would need counseling
to support him if the court permanently separated him from his mother.  The guardian ad litem supported termination
based on reading reports, meeting with the foster parents, and meeting
V.Y.  The guardian ad litem also
testified that she met with Yonko for forty-five minutes in jail, and that
Yonko was cooperative in providing information. 
The attorney ad litem opposed termination, stating that it would be in
V.Y.’s best interest to remain in contact with Yonko and that she believed V.Y.
would suffer permanent damage if not allowed to remain in contact with his
mother.  The trial court terminated
Yonko’s rights and appointed DFPS the sole managing conservator.

Standard of Review

The natural right that exists between
parents and their children is one of constitutional dimension.  See In re J.F.C., 96 S.W.3d 256, 273
(Tex. 2002) (examining constitutional implications of terminating parental
rights).  A parent’s right to “the
companionship, care, custody and management of his or her children” is a
constitutional interest “far more precious than any property right.”  Santosky v. Kramer, 455 U.S. 745,
758–59, 102 S. Ct. 1388, 1397 (1982) (quoting Stanley v. Illinois, 405
U.S. 645, 651, 92 S. Ct. 1208, 1212 (1972)). 
In a case terminating parental rights, therefore, we strictly scrutinize
the proceedings and strictly construe the law in favor of the parent.  Holick v. Smith, 685 S.W.2d 18, 20
(Tex. 1985).  In proceedings brought
under section 161.001 of the Family Code, the petitioner must establish one or
more of the acts or omissions enumerated under subdivision (1) of the statute
and must also prove that termination is in the best interest of the child.  Tex.
Fam. Code Ann. § 161.001 (Vernon 2005); In re J.L., 163 S.W.3d 79,
84 (Tex. 2005); In re L.M., 104 S.W.3d 642, 647 (Tex. App.—Houston [1st
Dist.] 2003, no pet.).

In termination of parental rights
cases, “due process requires that the State support its allegations by at least
clear and convincing evidence” to reduce the risk of erroneous
termination.  Santosky, 455 U.S.
at 747–48, 102 S. Ct. at 1391–92; In re B.L.D., 113 S.W.3d 340, 353–54
(Tex. 2003).  To be legally or factually
sufficient under the clear and convincing standard, the evidence must be such
that a fact-finder reasonably could form a firm belief or conviction about the
truth of the matter on which the State bears the burden of proof.  In re J.L., 163 S.W.3d at 84; Robinson
v. Tex. Dep’t of Protective & Regulatory Servs., 89 S.W.3d 679, 688
(Tex. App.—Houston [1st Dist.] 2002, no pet.). 


In a legal sufficiency challenge, we
review all the evidence in a light most favorable to the court’s finding, and
assume the fact-finder resolved disputed facts in favor of its finding if a
reasonable fact-finder could do so.  In
re J.L., 163 S.W.3d at 85.  We
disregard any evidence that a reasonable fact-finder could have disbelieved,
but we do not disregard undisputed facts. 
Id.  In reviewing a
challenge to the factual sufficiency of the evidence, we must give due
consideration to the evidence that the fact-finder reasonably could have found
to be clear and convincing, considering all the evidence in the record,
including evidence in support of and contrary to the trial court’s
findings.  In re J.F.C., 96 S.W.3d
at 266.  In reviewing all the evidence,
we also keep in mind that the State has the burden of proof in termination
proceedings.  See id. at 264.

Legal Sufficiency[2]

          The
trial court found that clear and convincing evidence existed to terminate
Yonko’s parental rights under Family Code section 161.001(1)(D), because she
knowingly placed the child in conditions which endangered his physical and
emotional well-being; under section 161.001(1)(E), because she engaged in
conduct or knowingly placed the child with persons who engaged in conduct that
endangered his physical and emotional well-being; and under section
161.001(1)(J)(i), because she had been the major cause of the failure of the
child to be enrolled in school as required by the Education Code.  See Tex.
Fam. Code Ann. § 161.001.  The
trial court further found, as required by the statute, that clear and
convincing evidence existed that termination was in the best interest of the
child.  See id.  Yonko challenges the legal sufficiency of
each of these findings.  

Though the trial court here found
that termination was justified under all three of the enumerated factors
alleged by DFPS, and that termination was in V.Y.’s best interest, a finding of
one enumerated factor coupled with a finding of the child’s best interest is
sufficient to support termination.  See
In re A.V., 113 S.W.3d 355, 362 (Tex. 2003) (“Only one predicate finding under section 161.001(1) is necessary to support a
judgment of termination when there is also a finding that termination is in the
child’s best interest.”); see also Latham v. Dep’t
of Family & Protective Servs., 177 S.W.3d 341, 348 (Tex. App.—Houston
[1st Dist.] Apr. 7, 2005, no pet.) (“A court may base a termination of parental
rights upon a finding that a parent engaged in conduct described in one of the
alleged grounds, plus a finding that termination is in the best interest of the
children.”).  A finding that the
termination was not in the child’s best interest is enough to justify reversal,
even if all of the enumerated factors are proven.  See In re A.V., 113 S.W.3d at 362.  We hold that the evidence was legally
sufficient to support termination under one enumerated factor and the child’s
best interest, but factually insufficient to support termination based on the
child’s best interest.  Thus, we address
the evidence supporting the enumerated factor and best interest.

 Failure to Enroll the Child in School

          The
trial court found termination of Yonko’s parental rights justified under
section 161.001(1)(J), because Yonko had been the major cause of “the failure
of [V.Y.] to be enrolled in school as required by the Education Code.”  See Tex.
Fam. Code Ann. § 161.001(1)(J). 
The Education Code provides that “a child who is at least six years of
age . . . shall attend school.”  Tex. Educ. Code Ann. § 25.085(b) (Vernon
Supp. 2005).  

Yonko admits that she never enrolled
V.Y. in school or otherwise provided him with a certified home-school
education, noting that she was molested while in school, and that she was not
settled enough to enroll V.Y. in school. 
Yonko further contends that she and V.Y. were never Texas residents for
any relevant time period under the statute. 
The State responds that Yonko was in Harris County for approximately two
months around the time she was charged with assault in March 2002, and that
V.Y. was age six at that time.  

The compulsory education statute does
not state a residency requirement, and the caselaw indicates that moving frequently
does not exempt a parent from the requirement of enrolling a child in school or
otherwise providing for his education. 
Yonko argues that viewing the Education Code as a whole, residency is a
requirement of enrollment.  See id. § 25.001(b)(1) (requiring schools to
admit children between ages five and twenty-one if they reside in school
district); id. § 25.001(c) (allowing districts to set minimum proof of
residency before admitting children). Yonko ignores, however, the many other
situations where the statute requires schools to admit children who are
non-residents.  For example, the statute
requires admission to school if the child is living with a parent who has joint
custody, if the person is homeless regardless of residence, if the person is a foreign
exchange student, or if the child is temporarily living with foster
parents.  Id. § 25.001(b)(2), (5),
(6), (f).  In Stuart v. Tarrant County
Child Welfare Unit, the court of appeals held that the parents’ need to
move frequently in the flea market circuit so they could support the family did
not excuse them from the requirements of the compulsory education statute.  677 S.W.2d 273, 280 (Tex. App.—Fort Worth
1984, writ ref’d n.r.e.), overruled on other grounds by In the
Interest of W.S.,
899 S.W.2d 772 (Tex. App.—Fort Worth 1995, no writ).  Viewing the evidence in this case in a light
most favorable to the ruling, the trial court reasonably could have formed a
firm belief or conviction that Yonko was the major cause of failing to enroll
V.Y. in school as required by the Education Code.

Best Interest of the Child

The Texas Supreme Court has provided
a non-exclusive list of factors that may be considered in determining whether
the termination of a parent’s rights is in a child’s best interest.  Holley v. Adams, 544 S.W.2d 367,
371–72 (Tex. 1976).   These factors
include (1) the desires of the child, (2) the emotional and physical needs of
the child now and in the future, (3) the emotional and physical danger to the
child now and in the future, (4) the parental abilities of the individuals
seeking custody, (5) the programs available to assist these individuals to
promote the best interest of the child, (6) the plans for the child by these
individuals or by the agency seeking custody, (7) the stability of the home or
proposed placement, (8) the acts or omissions of the parent that may indicate the
existing parent-child relationship is not proper, and (9) any excuse for the
acts or omissions of the parent.  Id.

          The
State need not prove all of the Holley factors as a condition precedent
to parental termination.  In re C.H.,
89 S.W.3d 17, 27 (Tex. 2002).  Undisputed
evidence of just one factor may be sufficient in a particular case to support a
finding that termination is in the best interest of the child, but the presence
of scant evidence relevant to each Holley factor will not support such a
finding.  Id; In re J.J.O.,
131 S.W.3d 618, 630–31 (Tex. App.—Fort Worth 2004, no pet.).  There is a strong presumption that the best
interest of the child is served by keeping custody in the natural parent.  In re B.M.R., 84 S.W.3d 814, 819 (Tex.
App.—Houston [1st Dist.] 2002, no pet.). 
For legal sufficiency purposes, we will consider those factors that
support the finding that termination was in the child’s best interest.  In re C.T.E., 95 S.W.3d 462, 464 (Tex.
App.—Houston [1st Dist.] 2002, pet. denied). 
The evidence raises two Holley factors supporting termination.

          1.  Parent’s Acts or Omissions 

          The evidence is undisputed that Yonko
failed to enroll V.Y. in school or otherwise provide a certified home-school
education.  The DFPS caseworker testified
that when V.Y. came into State custody, he could not recognize many letters and
some numbers, and he was unable to read, write, and do arithmetic.  The school he began attending placed V.Y. one
grade level behind, and required him to participate in one-on-one pull-out
groups for individual attention.  Yonko
admits that it was not in V.Y.’s best interest for him never to have been placed
in school.  Viewing the evidence in a
light most favorable to the ruling, the trial judge could have formed a firm
belief or conviction that Yonko’s failure to enroll V.Y. in school or teach him
to read or do math weighed in favor of termination of Yonko’s rights.

          In
addition, Yonko’s participation in an aggravated assault and subsequent
violation of community supervision weigh against Yonko on this issue.  Though Yonko testified that she was not
responsible for the assault, a reasonable fact-finder could have disbelieved
this testimony.  Yonko also testified
that she violated her community supervision to be with a sick grandfather, but
she nonetheless knowingly violated her community supervision by leaving Harris
County.  This factor weighs in favor of
termination.

          2.  Stability of the Home

          The
State also contends that termination is in V.Y.’s best interest because he
lived in many locales before the age of six. 
The evidence is undisputed that Yonko moved frequently when V.Y. was in
her care.  Though Yonko was inconsistent
in her estimation of the time they resided in each place, they had spent at
least some time in San Diego, Las Vegas, Phoenix, Houston, Chicago, Detroit,
and Hammond, Indiana, all by the time V.Y. was seven years’ old.  As to V.Y.’s current home environment, the
DFPS caseworker testified that V.Y. had bonded with his current foster family,
the second family with whom DFPS has placed him for care.  We hold that legally sufficient evidence
supports the trial court’s finding of best interest under this factor because
in this case Yonko failed to provide for V.Y.’s educational needs, but we
decline to hold that moving alone is tantamount to instability in the home if
the child’s other social, emotional, health, and educational needs are met.

Factual Sufficiency

Next, we balance the factors
presented in the legal sufficiency argument against the evidence that militates
against finding that termination is justified under the statute.  In re C.T.E., 95 S.W.3d at 464.  A court of appeals should consider whether
disputed evidence is such that a reasonable fact-finder could not have resolved
that disputed evidence in favor of its finding. 
In re J.F.C., 96 S.W.3d at 266. 
If, in light of the entire record, the disputed evidence that weighs
against termination is so significant that a fact-finder could not reasonably
have formed a firm belief or conviction that termination was justified, then
the evidence is factually insufficient to support termination.  Id. 
A court of appeals should
detail in its opinion why it has concluded that a reasonable fact-finder
could not have credited disputed evidence in favor of termination.  Id. at 266–67.

1. 
Child’s Desires

          The evidence is undisputed that V.Y.
loves his mother and wishes to live with her. 
Yonko testified that V.Y. “would go crazy” if her rights were terminated
because he is expecting to re-unite with her. 
The DFPS caseworker testified that V.Y. loves his mother and would be
“heartbroken” if he never got to see her again. 
The caseworker further testified that V.Y. would need counseling to
recover from the separation.  V.Y.
expressed his feelings toward his mother in one of the letters he sent her
after he was taken into DFPS custody:

Dear Mom, I love you forever I pray every night.  Mom send a couple of pictures of you am
writing to you soon.  I miss you
mom.  I pray every night even when I
eat.  I hope I see you again.  I hope you like the pictures I gave you.  I miss you mom.  Love [V.] forever from your son [V.]  

 

The DFPS caseworker also testified
that V.Y. told her he loves his mother and misses her, and that a bond exists
between him and his mother.  

The State points to In re W.S.M.,
107 S.W.3d 772 (Tex. App.—Texarkana 2003, no pet.), for the proposition that a
child’s love for his parents cannot override undisputed evidence that the
parents’ lifestyle endangers the child’s well-being.  We agree that the child’s desire to remain
with a parent is only one factor to consider among many, but love for a parent
cannot be ignored as a reflection of the parent’s ability to provide for the
child’s emotional needs.  Where the
evidence of the parent’s failures is not overwhelming, the desires of the child
weigh against termination of parental rights.

The facts of this case are easily
distinguishable from the facts of W.S.M. 
There, the evidence showed that the father was physically abusive to the
mother; the parents were unable to provide financially for the family; both
parents engaged in extensive drug use; at age seven, the child did not know how
to clean himself after using the restroom or how to tie his shoes; the mother
had neglected a health problem until it was so bad the child needed surgery;
the mother suffered from depression; and DFPS had intervened to try to help the
family before, but both parents refused to complete the family plan.  Id. at 773.  

Here, in contrast, the evidence
indicates that Perez was never violent toward Yonko or V.Y.; Yonko provided
financially for the family, sometimes earning as much as $600 in a day repairing
cars; and the only evidence of drug use occurred before Yonko became pregnant
with V.Y., many years before the termination proceeding.  No evidence exists that Yonko ever failed to
provide for V.Y.’s medical needs.  Yonko
completed all the required classes under the DFPS family supervision plan and
earned her G.E.D.  Moreover, Yonko placed
V.Y. in her mother’s care, together with $4,400 to defray expenses for V.Y. and
her criminal attorney. While separated from Yonko, V.Y. experienced problems
following directions, took cookies from an apartment complex leasing office,
and shot a BB gun through a window, but this evidence does not rise to the
level that establishes that Yonko’s lifestyle endangered the child as compared
to the circumstances in W.S.M.  See
id.  

Here, V.Y. was nine years’ old at the
time of the trial and capable of expressing his love for, and desire to remain
with, his mother.  V.Y. expressed this
desire through letters to his mother and statements to the DFPS
caseworker.  His mother returned this
affection in nearly 200 letters sent to him while she was incarcerated.  Combined with the DFPS caseworker’s admission
that V.Y. would be so affected by termination as to be heartbroken and would
require counseling, this factor of the “child’s desires” weighs against a
finding that termination was in V.Y.’s best interest.  

2. 
Emotional and Physical Needs of the Child Now and in the Future

The evidence indicates that Yonko
provided for the physical and emotional needs of V.Y. before her incarceration.
 Yonko testified that she provided V.Y.
food, clothing, shelter, and love while he was in her care.  This evidence is undisputed.  V.Y.’s love for his mother and desire to be
with her further indicate that she was providing for his emotional needs, and
that his emotional well-being in the future is dependent upon maintaining a
relationship with his mother.  Yonko
testified that she has always been employed, and can make anywhere from $100 to
$600 a day repairing cars.  She has also
made money selling potpourri and roses, and was able to save $4,400 which she
intended to use to rent an apartment and purchase a more reliable car.  DFPS put on no evidence to indicate that
Yonko herself had ever failed to provide for the physical or emotional needs of
her child.  Rather, that evidence relates
to the lack of care V.Y. received from relatives after Yonko’s incarceration.

Although it is undisputed that Yonko
left her son in the care of her mother, together with $4,400 she had saved, the
State contends that the trial court was within its discretion to believe that
the money was for an attorney rather than V.Y. because Yonko initially
testified that she had not provided financial support for V.Y.  The State, however, mischaracterizes the
testimony on this issue.  While Yonko was
questioned by the State regarding the arrangements she made for V.Y.’s care
while she was in prison, the State asked with whom she had left her son.  Yonko responded that her mother, brother, and
sister-in-law would all be taking care of him. 
The State next asked whether she provided her family members with any
financial support for the child.  Yonko
responded that she was in prison and thus could not send them money.  The State then asked Yonko whether she had
saved any money prior to becoming incarcerated, to which she replied that she
had saved $4,400, which she had intended to use to rent an apartment and
purchase a better car.  The State asked
whether she turned that money over to her mother for the care of V.Y. and she
responded that she had.  The State asked
whether the money was used on V.Y.’s behalf. 
Yonko stated that it was supposed to be. 
The State then stated that the question was whether Yonko knew that the
money was spent on her son’s behalf. 
Yonko responded that she was pretty sure it was.  This testimony does not indicate that Yonko
initially denied leaving the money for the care of her son; rather, it
indicates that Yonko belived the question was whether she had sent money since
becoming incarcerated, to which Yonko honestly replied that she had not.  The State’s own questions indicate that the
State knew Yonko had left money, and was attempting to clarify this issue for
the court.

The evidence suggesting that Yonko
did not provide for V.Y. comes from the period while Yonko was incarcerated.  The DFPS caseworker admitted Yonko could not
know that Yonko’s mother would not care for her son.  The DFPS caseworker also testified that she
had doubts about Angelo’s story that he picked V.Y. up from Arizona where he
was staying with his father.  Yonko
testified that she was shocked to discover that her family failed to properly
care for V.Y.  Furthermore, the evidence
is undisputed that Yonko sent over 200 letters to V.Y. during the time he was
in DFPS care, assuring him that she loved him and they would be together again
soon.  

Yonko threatened V.Y.’s needs when
she violated her community supervision, thus resulting in incarceration.  The Texas Supreme Court has held, however,
that incarceration alone is not a sufficient basis for termination of parental
rights.  Tex. Dep’t of Human Servs. v.
Boyd, 727 S.W.2d 531, 533 (Tex. 1987).  Yonko was scheduled to be released from prison
within thirty days of this trial, and repeatedly expressed her intentions to
secure a job and an apartment, and enroll V.Y. in school, thus indicating that
she did not intend to repeat her mistakes in the future.  Yonko also completed classes in anger
management and parenting, and completed her G.E.D. while in prison, further
indicating she would be able to provide for V.Y.’s needs.  We hold that this factor weighs against
termination, given the caseworker’s assessment of V.Y.’s emotional need for his
mother, and the lack of evidence from the State as to emotional or physical
abuse or neglect by the mother.

3. 
Emotional and Physical Danger to the Child Now and in the Future

The only evidence of any potential
danger to V.Y. was from Yonko’s stepfather. 
Yonko testified that her stepfather was abusive to her mother, Betty,
when she was a child, that V.Y. had seen Yonko’s stepfather spill whiskey on
Betty, and that Betty was unable to testify at this trial because she fled to
California when her husband threatened to kill her.  Yonko testified that they lived with her
mother for less than a month when V.Y. was a child, and that she left V.Y. with
Betty when she went to prison.  The State
contends that V.Y. was therefore exposed to potential family violence.  However, the State does not dispute Yonko’s
testimony that Betty always either called the police or left when her husband
was violent.  Nor does the State dispute
Yonko’s testimony that she told her mother to get a restraining order, and that
something would have to be done about the situation with her stepfather before
she would bring V.Y. around Betty.  Yonko
also testified that she changed residences to protect V.Y. from her stepfather
and avoid any violent situations.  This
evidence indicates that Yonko and Betty took steps to avoid potential violence
by the stepfather, and to keep V.Y. away from such violence.  

In addition, the evidence indicates
that emotional harm to V.Y. would result if Yonko’s parental rights were
terminated.  The DFPS caseworker
testified V.Y. would need counseling to overcome the separation, and that he
would be heartbroken.  Yonko testified
that V.Y. would go crazy because she had been assuring him in her letters that
they would be together again soon.  The
attorney ad litem appointed to represent V.Y. also opposed termination because
of the negative emotional impact she believed it would have on V.Y.  Given the lack of evidence of any physical or
emotional endangerment to V.Y. while in his mother’s care, a reasonable fact-finder
could not have formed a firm belief that emotional or physical danger to the
child would result from allowing Yonko to retain rights to her son.

4. 
Parental Abilities of the Individual Seeking Custody

Yonko’s failure to enroll V.Y. in
school for the one-year period during which he was in her care and required to
attend school, and Yonko’s frequent moves, cause concern for her parental
abilities.  Also, Yonko’s testimony that
she occasionally had others read legal documents for her or write things to be
submitted to DFPS indicates that she might have a difficult time helping V.Y.
with his school work.  Yonko testified
that she did not attend school very often as a child.  Yonko also testified that she learned the
value of education in prison, and that she pursued and completed her
G.E.D.  In addition to her G.E.D.
classes, Yonko took classes on parenting, life skills, anger management, and
bible studies.  Yonko testified that she
intended to put V.Y. in school, and that she wanted him to be a lawyer or a
pastor.  The DFPS caseworker testified
that V.Y.’s only special need was reading, and recognized that within a few
months of being in custody, V.Y. was writing letters to his mother.  Yonko testified that prior to her
incarceration, she provided V.Y. with books, and that if she was to regain
custody after being released, she would help V.Y. study and do whatever it took
personally to help him get through school. 
We hold that a reasonable fact-finder could not have formed a firm
belief or conviction that Yonko lacked the parental abilities necessary to care
properly for V.Y.

5. 
Programs Available to Assist the Individual

Yonko testified that when she was
released from prison, she intended to stay in a halfway house until she could
get on her feet.  She also testified that
Project R.I.O. was willing to give her a job despite her felony conviction.  The only evidence offered by DFPS was that
counseling would be available to help V.Y. adjust to his foster family.  DFPS did not contradict Yonko’s testimony that
Project R.I.O. would help her find a job, or that she would be able to stay in
a halfway house.  A reasonable
fact-finder could not have formed a firm belief or conviction that that this
factor weighs in favor of termination of Yonko’s rights, and we therefore
conclude that it does not weigh in favor of termination.

6. 
Any Excuse for the Parent’s Acts or Omissions

Yonko testified that the reason she
did not place V.Y. in school was that she was molested as a student and did not
want him to endure a similar experience. 
This does not excuse her failure to educate V.Y., but her concern for
the child’s well-being was a factor in her decision not to place him in
school.  In addition, Yonko’s pursuit of
her own G.E.D. and other life-skills classes while in prison, and repeated
testimony that she learned the value of education while incarcerated, further
indicate that Yonko understands that V.Y. must be enrolled in school.

Yonko’s decisions resulting in her
incarceration were poor ones, despite her professed justification that she did
it to further the needs of her family and her son by attempting to care for a
sick relative and avoid leaving her son alone while in prison.  However, viewing all the evidence, Yonko has
also demonstrated an ability to care for V.Y. and has made an effort to improve
her parenting abilities for the future.  We
therefore hold that this factor does not weigh strongly against or in favor of
termination of Yonko’s parental rights, and that termination of Yonko’s parental
rights cannot be upheld in this case merely because the excuses for her acts
and omissions are inadequate.

7. 
Plans for the Child by the Parent and DFPS

Yonko testified that she intended to
get a job, find an apartment, and place V.Y. in school.  Yonko was scheduled to be released from
prison less than thirty days after the trial in this case.  She estimated that she might have to stay in
a halfway house at first, and that it would probably take her a couple months
to get on her feet.  The fact that Yonko
had been able to save $4,400 prior to her incarceration indicates that she can
be financially responsible.  She
testified that she might ask for financial assistance from Betty, but that she
did not intend to stay with her.  Yonko
testified that she would spend extra time and do additional home schooling if
necessary to help V.Y. with his school work. 
Yonko had complied with all the terms of the family plan that she could
possibly comply with while in prison, by taking the required classes, and DFPS
presented no evidence to suggest that she would not comply with the rest of the
terms when released from prison.

DFPS presented evidence that V.Y.’s
present foster family has considered adopting him, but had not made a final
decision at the time of trial. The DFPS caseworker testified that she believed
V.Y. was adoptable, because DFPS believes all children are adoptable.  It is undisputed that V.Y.’s reading and
writing had improved and that he had bonded with his foster family.  It is also undisputed that V.Y. was already
in his second foster home in six months. 
DFPS presented no evidence that it had taken any steps to provide a
permanent home for V.Y.  This factor
weighs against termination.

          The
Overall Assessment of Best Interest

          Reviewing
the factors that weigh in favor of and against termination, we hold the
evidence is factually insufficient to support termination of Yonko’s parental
rights under the clear and convincing evidence standard because (1) the
caseworker’s opinion supporting termination is substantially undermined by her
further assessment of the psychological and emotional damage she concedes would
result to the child from termination, with no testimony as to how this damage
could be ameliorated other than a reference to counseling; and (2) the State
presented scant evidence the trial court could credit as to Yonko’s future
inability to meet the needs of the child under the Holley factors so as
to overcome the caseworker’s assessment of the emotional risk to the child.  See In re K.C.M., 4 S.W.3d 392,
394–95 (Tex. App.—Houston [1st Dist.] 1999, pet. denied)
(evidence supporting termination found factually insufficient to establish best
interest where mother developed relationship with child prior to incarceration
for drugs, wrote numerous letters while incarcerated discussing her plans to
reunite with child, did nothing to endanger child after she signed service
plan, and had only seventy-five days before release from prison at time of
termination trial).[3]  The facts in this case parallel the facts in K.C.M.  Given the presumption that children should
remain with their parents, and given the high evidentiary standard that the
statute requires the State to meet, a reasonable fact-finder could not have
found factually sufficient evidence exists to form a firm belief or conviction
that termination in this case is in V.Y.’s best interest. 

Conclusion

          We
hold that the evidence was legally sufficient to support termination of Yonko’s
rights based on her failure to enroll V.Y. in school and her failure to provide
V.Y. with a stable home environment, and that termination was in V.Y.’s best
interest.  We hold that the evidence was
factually insufficient to support termination, however, because in weighing all
of the Holley factors, a reasonable fact-finder could not have formed a
firm belief or conviction that termination of Yonko’s parental rights was in
V.Y.’s best interest.  Accordingly, we
reverse the judgment of the trial court and remand for a new trial.

 

                                                          Jane
Bland

                                                          Justice

 

Panel consists of Chief Justice
Radack and Justices Alcala and Bland.

 











[1] As we have issued a new opinion on rehearing, we deny
the State’s motion for en banc reconsideration as moot.  See Brookshire Bros. v. Smith, 176
S.W.3d 30, 40 n.2 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (supp. op.
on reh’g).

 





[2] When both legal and factual sufficiency issues are
raised, we decide the legal sufficiency issue first.  Glover v. Tex. Gen. Indem. Co., 619
S.W.2d 400, 401 (Tex. 1981).

 

 





[3] We note that this court decided K.C.M. using a standard of review that the Texas Supreme Court has
since disapproved.  See In re C.H.,
89 S.W.3d 17, 25–26 (Tex. 2002).  Now,
the appropriate appellate standard for reviewing parental termination factual
findings is whether the evidence is such that a fact-finder reasonably could
have formed a firm belief or conviction about the truth of the State’s
allegations.  Id. at 25. This
standard retains the deference an appellate court should have for the
fact-finder’s role.  Id. at 26.  Nevertheless, K.C.M. illustrates evidence
that lacks factual sufficiency even under the present standard.